**J. E. MATER, Appellant,**

v.

**HUPP CORPORATION and Gibson Refrigerator Company, a Division of Hupp Corporation, Respondents.**

No. 47066.

Supreme Court of Missouri,

Division No. 1.

July 13, 1959.

As Modified on Court's Own Motion
July 15, 1959.

Donald F. Price, Kansas City, for appellant.

Martin J. Purcell, James C. Mordy, Morrison, Hecker, Buck, Cozad & Rogers, Kansas City, for respondents.

COIL, Commissioner.

J. E. Mater was employed by Gibson Refrigerator Company as divisional sales manager from March 1953 until June 15, 1956, when he was discharged. He sought a declaratory judgment construing a letter attached to his petition which he alleged was a contract of employment for the period of one year subsequent to October 1, 1955. He averred that there was $9,982.69 due him, less $1,017.31 which he owed Gibson, making the net amount claimed and in dispute $8,965.38. Plaintiff also sought an accounting to establish that the claimed amount was in fact due under the compensation plan in his alleged employment contract.

Defendants admitted that plaintiff was employed by Gibson as division 11 sales manager (for refrigerators, freezers, ranges, and room air conditioners) from March 1953 until June 15, 1956, when he was discharged. Defendants claimed that plaintiff's employment was terminable at will and that under the compensation plan there was a net amount due plaintiff of $301.55.

The trial court adjudged that plaintiff's employment was terminable at will and that plaintiff was entitled to compensation in accordance with the plan in force between the parties on sales on and prior to June 15, 1956, and ordered defendants to, and defendants did, render an accounting which resulted in a net judgment for plaintiff in the sum of $301.55.

The case was tried by the court below and thus on review we weigh the evidence and arrive at our own conclusion as to its weight.

The letter plaintiff relied on as his employment contract was from Gibson to him dated October 17, 1955, and had as its sub-

**101**

ject: "Divisional Sales Managers Compensation Program for Gibson Fiscal Year October 1, 1955 through September 30, 1956." It was obviously a form sent to all divisional sales managers with the name of a particular manager and the quota assigned to him inserted to individualize each letter.

The first and second paragraphs predicted a good 1956 fiscal year for Gibson and enjoined plaintiff to promote and sell the Gibson line through his distributors and dealers, and the third is: "With a great deal of pleasure I am happy to present your compensation plan for the year 1956.

"Your Minimum Quota
Net Billing Dollars ------------------------------------$843,166.00 .

Your Base Quota
Net Dollars based on Gibson
Billing to your Distributors ----------------------------$500,000.00 .

For the first hundred thousand
net billings above base quota -------- one-half of one percent.

Next hundred thousand -------------- three-quarters of one percent.

Next hundred thousand -------------- one percent.

Next hundred thousand -------------- one and one-quarter percent.

Next hundred thousand -------------- one and one-half percent.

All over this point ------------------ one and one-half percent, until combined salary and bonus earnings equal the ceiling of $17,500.00"

The fourth, fifth, and sixth paragraphs had to do with the elimination from consideration of certain items in determining plaintiff's compensation. And the letter concludes: "The Gibson program for 1956 is bigger and better than ever * * * and we are expecting each of our Divisional Sales Managers to earn a handsome bonus. It's a year of opportunity for all of you. Remember * * * Sell More * * * Have More! Good luck!"

Plaintiff admitted that at the time he was employed he executed a document headed "Employment Application and Record." That application contained information as to plaintiff's background and showed that he was employed in the sales department as divisional sales manager at $700 per month. It also contained this, addressed to Gibson over the signature of plaintiff under date of March 23, 1953: "I understand that I am not employed for any definite period of time. Anything herein to the contrary not with-

standing. * * * I have read and accepted this printed contract."

It is thus apparent that plaintiff's original employment was terminable at will and if he was employed for a definite term consisting of the fiscal year October 1, 1955 to September 30, 1956, it was by virtue of some arrangement between the parties different from and entered into subsequent to the contract of March 1953. While plaintiff relies principally on the October 17, 1955 letter as establishing that he was employed for the full 1955–56 fiscal year, he also points out that a memorandum was furnished him at the time of his employment outlining the Gibson Refrigerator Company's compensation plan which stated, among other things, that the plan provided: a guaranteed base salary payable semi-monthly, that the company would pay approved traveling and other expenses, a retirement program, a life insurance program, and certain "incentive" commissions; and

that thereafter letters setting forth plaintiff's annual sales quota and base quota for six months of the fiscal year 1952–53 and for fiscal years 1953–54 and 1954–55 were delivered to plaintiff. In so far as concerns the present question, however, those letters in so far as they are similar, are essentially the same as the letter of October 17, 1955, attached to plaintiff's petition, and thus, in our view, the decisive question is whether the 1955 letter changed or modified plaintiff's employment from one terminable at will to one for the period of one year subsequent to October 1, 1955.

■ It is clear to us that there is nothing in the letter of October 17, 1955 which changed plaintiff's written employment agreement entered into in March 1953. The October 17, 1955 letter clearly dealt with the subject of a compensation program and plan; it did not purport to relate to or deal with the length of plaintiff's employment. The fact that the letter presented a "compensation plan for the year 1956" and otherwise referred to 1956 as a big year in prospect reasonably could not have meant that plaintiff was thereby employed for the entire fiscal year 1956 when the letter's language is viewed in the light of the written contract wherein plaintiff had theretofore agreed that his employment was for an indefinite time. None of the language employed in the 1955 letter evidenced an intention to change or modify plaintiff's existing indefinite term of employment. We recognize that where the compensation rate is agreed on for a year that, even though such alone is not sufficient to establish an employment for a year, the fact may be some evidence of the intention of the parties. Davis v. Pioneer Life Ins. Co. of America, 181 Mo.App. 353, 356, 172 S.W. 67, 68 [1, 2]. Under the instant facts, however, the October 17, 1955 letter must be viewed in the light of the fact that plaintiff's employment had theretofore been fixed as one terminable at will. When so viewed the most reasonable conclusion is that plaintiff's employment was terminable at will and that defendants could discharge

plaintiff at any time with or without cause. Christy v. Petrus, 365 Mo. 1187, 295 S.W. 2d 122, 124 [1].

■ It is conceded that plaintiff's net billings from October 1, 1955 through June 15, 1956 (date of discharge) exceeded plaintiff's base quota of $500,000 established in the October 17, 1955 letter. Plaintiff contends that consequently he was entitled to his monthly salary (which had been increased to $750 in March 1956) for the remainder of the fiscal year and to commissions on all billings in his territory in excess of the $500,000 base quota until the end of the fiscal year, despite his discharge. Plaintiff's point, as we understand it, is that once his billings exceeded his base quota he had earned his salary or "draw" for the remainder of the year and also that he thereby became vested with a right to receive commissions on all billings in his former territory for the remainder of the fiscal year. We cannot agree. We think it is clear that the compensation provided for in the October 17, 1955 letter, whether salary or drawing account or commission, was to be paid at the stated rates for whatever portion of the 1955–56 fiscal year plaintiff worked for Gibson.

■ There is no merit in plaintiff's contention that the trial court erred in entering its interlocutory decree requiring defendant to account. Plaintiff petitioned the court to order an accounting, did not object at the time the court so ordered, and, in any event, no possible prejudice to plaintiff could have resulted from the procedure whereby the amount due him was determined.

The remainder of plaintiff's contentions relate to the accounting. The trial court held that in arriving at the amount due plaintiff the $500,000 base quota established for him in the October 17, 1955 letter should be reduced to a figure equal to 8½ twelfths thereof ($354,166.67) because plaintiff's employment had continued for only 8½ months of the fiscal year. Plaintiff says the trial

court thereby made a new contract for the parties and one contrary to the interpretation the parties had placed on their contract. In view of the fact, however, that we have held plaintiff's employment was terminable at will and that plaintiff was entitled only to what was due to the date of his discharge, plaintiff would not wish to insist that his base quota should have remained at $500,000, for, obviously, the lower the base quota, the greater the amount of commission accrued under the compensation plan. In any event, the trial court's action in that respect was correct.

One of the items involved in the accounting had to do with certain merchandise returned to Gibson after the termination of plaintiff's employment. Plaintiff, as noted, was sales manager for division 11, which included a portion of Oklahoma. One of Gibson's Oklahoma accounts was the Leo Maxwell Company which (for the fiscal year in question, 1955–56) entered into some kind of special arrangement with Gibson with respect to window air conditioners. Gibson sent a letter dated December 27, 1955 to Maxwell, a copy of which plaintiff adduced in evidence, setting forth the terms of an arrangement whereby Maxwell was to attempt to sell 2,500 Gibson window air conditioners during the 1956 season. That letter was in part:

"In order to accomplish the goal of selling 2500 window air conditioners during the 1956 selling season, we tentatively agreed that Gibson would place as many air conditioners as required up to 2500 pieces in the Leo Maxwell Company's warehouse on the Guaranteed Sales basis. The Leo Maxwell Company is to provide Gibson with copies of invoices as these air conditioners are shipped to your dealers. The Gibson Refrigerator Company will invoice the Leo Maxwell Company for the air conditioners upon receipt of these invoices with a due date of July 15, 1956.

"The Leo Maxwell Company will offer their dealers a dating plan showing a due date of approximately July 1, 1956 and will guarantee to his dealers sale of 40% of the number of units purchased by the dealers during this period of January through July 1, 1956.

"Based on the above terms, the Leo Maxwell Company will owe Gibson for all the air conditioners shipped and sold prior to July 15, 1956, and will make payment to Gibson Refrigerator Company on that date.

"Any air conditioners remaining in the Leo Maxwell Company's inventory as of July 15, 1956 will become Gibson's property.

"As you no doubt recall, Leo, it was discussed as to whether or not Gibson's inventory in your warehouse should be in a bond or under the Lawrence Warehouse plan, but in order to eliminate a lot of bookkeeping and considerable expense to your organization, it was decided not [to] use any type of a bonded warehouse. This, in effect, puts these units in your warehouse on a consignment basis."

Defendants' evidence was that on August 9, 1956 Maxwell cancelled his Gibson franchise as of September 1 and returned all the air conditioners he then had on hand, and defendants deducted from the total of plaintiff's net billings a certain amount covering those returned items. Plaintiff contends that his net billings should not have been reduced by any amount by reason of those returns because the air conditioners in question had been sold to Maxwell and Maxwell owed Gibson therefor, and if a subsequent arrangement for the return of some of that merchandise was made between Gibson and Maxwell, that fact should not affect the total of plaintiff's net billings—particularly in view of the fact that the "return deal" was effected after defendants contended plaintiff's employment had terminated.

Photostatic copies of the original invoices were produced by defendants as part of the accounting. The part of the December 27, 1955 letter heretofore set forth is,

at best, ambiguous as to what the proposed arrangement was. The first paragraph provides that up to 2,500 air conditioners were to be placed in the Maxwell warehouse and that Maxwell, after he shipped all or part of those air conditioners to his dealers, with a July 1 payment date, was to furnish Gibson copies of those invoices and Gibson would *thereafter* invoice the air conditioners (already in the Maxwell warehouse) to Maxwell with a payment due date of July 15, 1956. Many of the photostatic copies of the invoices from Gibson to Maxwell covering air conditioners did show due dates of July 16, indicating that at least in part the arrangement just mentioned was followed. It is true, as defendants contend, that there are other portions of the part of the letter heretofore set forth which indicate that the air conditioners were on consignment and also that the air conditioners unsold on July 15, 1956 "will become Gibson's property." The trouble with the first of defendants' contentions in those respects is that Gibson's statement in its letter that the air conditioners were, in effect, on consignment, appears to have been the writer's conclusion, based solely on the fact that it had been decided not to use a "bonded warehouse." Even if, however, the air conditioners were on consignment originally, still they were not to be invoiced to Maxwell by Gibson until Maxwell had shipped and invoiced them to his dealers. Consequently, it would appear that the air conditioners covered by Gibson's invoices (which included the merchandise returned) were in fact *sold* to Maxwell after they had been invoiced by Maxwell to its dealers. And the expression in the letter that the air conditioners on hand as of July 15, 1956 "will become Gibson's property" may be construed as indicating that the air conditioners had in fact been sold to Maxwell and were, in some manner, to thereafter *become* Gibson's property.

■ Further, the evidence does not show whether the terms of the December 27,

1955 letter were in fact the terms of the Maxwell deal as actually consummated and transacted. It does appear that none of the returns was effected until after Maxwell had cancelled his franchise as of September 1, 1956, and it does appear that the credit memorandums by which Gibson credited the Maxwell account by reason of the returned merchandise were not issued until October and November 1956, which is some support for the conclusion that the Maxwell deal was not consummated and transacted in accordance with the terms of the letter of December 27, 1955. It may be, of course, that the "guaranteed sales basis" and Maxwell's guarantee to dealers referred to in the letter properly explained and supported by original records, and a full disclosure of the Maxwell arrangement as actually transacted, would have established defendants' right to the credit claimed. The decisive consideration in our view of the matter, however, is that defendants were called upon to account and they had the duty to establish just what the arrangement was with Maxwell which gave them the right to deduct an amount covering the returned merchandise from the amount which had been theretofore credited to plaintiff's net billing account; and, in our judgment, defendants did not sustain that burden in a reasonable manner by relying upon a copy of an ambiguous letter adduced in evidence by plaintiff.

Defendants further contend, however, that, irrespective of what the arrangement with Maxwell may have been, plaintiff's net billing account was properly reduced by the amount of the Maxwell returns. Defendants point to the testimony of Gibson's vice-president who said that it was not the policy of the company or of the industry to pay commissions on merchandise for which no payment had been received, and to a paragraph in the letter setting forth plaintiff's sales quota for the fiscal year 1953–54 which stated that "Returns * * * are charged back against billing figures."

As we see it, whether a sum representing the amount of Maxwell returns should have been deducted from the net billings theretofore credited to plaintiff's account, depended upon what the understanding between Gibson and plaintiff was in that respect. While it may be that the provision of the letter heretofore mentioned concerning returns evidenced an understanding between defendants and plaintiff on the subject, the difficulty is whether the items returned by Maxwell came within the definition of "returns" as used in that letter. That is to say, would "returns" include only returns which the buyer had a right to make in accordance with the terms of the sale, or would they include returns that were made by a buyer as a result of a subsequent independent arrangement made after the merchandise had been finally sold to the buyer and after the amount involved had been credited as *"net* billings"?

It is our conclusion that defendants, with all of Gibson's records and personnel apparently available, did not sustain their burden to demonstrate or furnish the means for demonstrating the accuracy of the bases for the accounting they made. Certainly defendants had the duty and the burden to remove the question of their right to credit for the Maxwell returns from the realm of conjecture and speculation; and that, defendants failed to do. We are of the opinion, therefore, that in accounting to plaintiff for commissions due, defendants are not entitled to any credit on account of the air conditioners returned by Maxwell.

The other question with respect to the accounting is whether the defendants correctly deducted from the total of plaintiff's net billing account an amount of $33,446.13 representing special promotional allowances made to Maxwell on the prices of the air conditioners sold to him.

Defendants, as part of their accounting, attached what they called "Schedule A" which purported to show "Amounts included in price on which no commission is paid." Thereon are listed (for each model of air conditioner) various amounts as charges for co-op advertising, warranty, reserve, excise tax, and freight, and the total of such items for each model. Those schedule A items appear to be standard charges applying, we take it, to all room air-conditioner sales unless otherwise specified. Defendants furnished plaintiff, as its division 11 sales manager, sheets containing IBM tabulations for each month showing the sales by units and amount to distributors in his district. Prior to his discharge, plaintiff had received such IBM sheets for each month from October 1955 through April 1956. The monthly totals of sales to Leo Maxwell, as shown by the IBM figures (which, according to defendants' letter of August 20, 1954, represented *net billings* to the customer) disclosed that plaintiff had been credited with the unit prices shown on the Maxwell invoices, less schedule A items, although the schedule A items were not deducted on the invoices and although certain promotional allowance items were deducted on the faces of those invoices and not deducted from the IBM net billing figures.

It seems apparent that whatever the exact arrangement with Maxwell was, some kind of special arrangement was entered into with that company with respect to amounts allowed per unit (promotional allowances) to promote the sale of the merchandise by Maxwell to its dealers; and, as we have noted, the promotional allowance per each respective unit was deducted from the base prices on the invoices from Gibson to Maxwell. In many instances those invoices also included the freight allowance to Maxwell for each shipment. As heretofore noted, two of the schedule A items were co-op advertising and freight. Gibson's letter of December 27, 1955 specifically provided that the prices to Maxwell did not include the "standard co-op" and referred to a special co-op allowance. A reasonable conclusion is that whatever the final arrangement with Maxwell was, the promotional allowances

shown on the invoices were in lieu of the standard schedule A co-op advertising charges usually made and the standard schedule A freight allowance items were washed out by the actual freight allowances shown on the invoices.

Defendants, in making their accounting, took the unit prices shown on the Maxwell invoices, deducted therefrom the total of the schedule A items applicable to the models involved, deducted therefrom the respective promotional allowances per unit as shown on the invoices, and arrived at a figure they called the "net billing price on Leo Maxwell sales." And inasmuch as the plaintiff's net billing account had not theretofore been charged with the amounts of those respective promotional allowances, defendants deducted the total of those items from plaintiff's sales.

■ Thus, it appears that the IBM figures furnished to plaintiff showed his net billing figure represented the unit prices of the air conditioners less the schedule A items. That would indicate that it was the usual procedure not to pay commissions on schedule A items but to deduct them from invoice base prices to determine the amount of a sales manager's net billings. It also appears that the Maxwell special promotional allowances were actually deducted from the unit prices at which the air conditioners were sold to Maxwell. We are of the opinion, therefore, that defendants were entitled to deduct from base prices both schedule A items and promotional allowances in arriving at the total of plaintiff's net billings except in so far as certain schedule A items (co-op advertising and freight) had been replaced by special promotional allowances or washed out by freight allowances actually made.

It follows that the total of those two items, i. e., the standard co-op advertising item which was replaced by or consumed in the promotional allowances shown on the invoices, and the schedule A item of freight expense which was washed out by the actual freight allowances made on the invoices, should be added to the amount of plaintiff's sales in order that defendants will not be allowed duplicate deductions.

As we have computed it from defendants' figures, the total of the schedule A co-op advertising items deducted from plaintiff's net billings which should have been included therein is $5,365. Inasmuch as the total of the applicable schedule A freight expense items is $8,584.61 and the actual freight allowances shown on the Maxwell invoices covering air conditioners are $7,-427.95, and inasmuch as there are some invoices covering shipments of air conditioners on which no freight allowances are shown, we shall not change the total of plaintiff's sales because of the freight allowances item.

Defendants' accounting which was approved by the court was:

"Corrected Commission Statement
J. E. Mater
October 1, 1955—June 15, 1956

| | |
|---|---|
| Sales | $ 715,616.65 |
| Less Prom. Allowances | 33,446.13 |
| | 682,170.52 |
| Less Returns | 87,630.23 |
| | 594,540.29 |
| Less Quota | 354,166.70 |
| Commission based on | $ 240,373.59 |
| ½ of 1% on 1st $100,000 | $ 500.00 |
| ¾ of 1% on 2nd $100,000 | 750.00 |
| 1% on balance | 403.74 |
| Gross Commission | $ 1,653.74 |
| Less F. I. C. A. | 37.21 |
| | 1,616.53 |
| Less Withholding Tax—18% | 297.67 |
| | 1,318.86 |
| Less Accounts Receivable | 1,017.31 |
| Net Commission | 301.55" |

The disallowance of "returns" and the addition of the total of the schedule A

co-op advertising items, result in this accounting:

| | | |
|---|---|---:|
| Sales | .........................................$ | 720,981.85 |
| Less promotional allowances | .......... | 33,446.13 |
| | $ | 687,535.52 |
| Less base quota | ........................ | 354,166.70 |
| Commission based on | ....................$ | 333,368.82 |
| ½ of 1% on 1st $100,000 | .................$ | 500.00 |
| ¾ of 1% on 2nd $100,000 | ................. | 750.00 |
| 1% on 3rd $100,000 | ...................... | 1,000.00 |
| 1¼% on balance | ......................... | 417.11 |
| Gross commission | .......................$ | 2,667.11 |
| Less F. I. C. A. | ..................... | 60.01 |
| | $ | 2,607.10 |
| Less withholding tax, 18% | .......... | 480.08 |
| | $ | 2,127.02 |
| Less accounts receivable | .......... | 1,017.31 |
| Net commission | .....................$ | 1,109.71 |

The judgment of the trial court as modified above is affirmed and the case is remanded with directions to enter a judgment for plaintiff in the sum of $1,109.71 as of the date of the original judgment. The costs on this appeal are assessed one half against appellant and one half against respondents.

HOLMAN and HOUSER, CC., concur.

PER CURIAM.

The foregoing opinion by COIL, C., is adopted as the opinion of the court.

All concur.